FILED

2012 Apr-12  PM 03:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| LISA DALENA BROCK, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO. CV 11-J-2856-S |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter is before the court on the record. This court has jurisdiction pursuant to 42 U.S.C. § 405. The plaintiff is seeking reversal or remand of a final decision of the Commissioner. All administrative remedies have been exhausted.

### Procedural Background

Plaintiff applied for Supplemental Security Income benefits on April 22, 2009, alleging disability beginning March 1, 2008, due to problems related to hepatitis C and bipolar disorder (R. 40-41, 55, 116).[1] The administrative law judge ("ALJ") denied plaintiff's application on January 26, 2011 (R. 14-22). The Appeals Council denied her request for review on June 15, 2011 (R. 3-5). The ALJ's decision thus

---

[1] Plaintiff's application for benefits is not included in the record; only the Disability Determination Transmittal is included. *See* R. at 55.

1

became the final order of the Commissioner. *See* 42 U.S.C. § 405(g). This action for judicial review of the agency action followed (doc. 1). The court has considered the entire record and whether the decision of the ALJ is supported by substantial evidence. For the reasons set forth below, the decision of the Commissioner is due to be **REVERSED**.

## Factual Background

Plaintiff was 40 years old at the time of her hearing, and has a high school education plus "about half a year" of community college (R. 35-36). She has one child, a young daughter; the daughter lives with her father, and the plaintiff has custody and assists with child care (R. 33-34). Plaintiff has no significant past relevant work experience, as testified to by the Vocational Expert ("VE") present at the hearing, and her lifetime income is de minimis (R. 49-50).[2]

Plaintiff testified that she has "been labeled bipolar," and listed several medications she takes to help with the associated symptoms (R. 40, 166). She complains of getting "very sick," with severe headaches, vomiting, mood swings, difficulty remembering things, and depression such that she "do[esn't] make it out of

---

[2] In the Disability Report, plaintiff wrote that the longest job she has held was as a "contractor clean up person," for three months in 1998 (R. 117). She worked a 40-hour week at a rate of pay of $9.00/hour  (R. 117). Plaintiff also lists a few other short-term jobs, held for less than two months each, over a decade ago. *See* R. at 129-37.

bed" (R. 40-41). She also complains of "degeneration of the back," which causes her to fall down when she gets out of bed (R. 40). She claims her medicine causes her to "get to where [she] won't eat" and become "so weak [she] can't move" because she has no appetite, and that she has had significant weight fluctuations (R. 41-42). Plaintiff claims that she is not able to work because of her mental health, as she "couldn't deal with the public and people in general" (R. 46).   In her Disability Report, plaintiff wrote that her ability to work is limited by bi-polar disorder, hepatitis C, and nerve disorder, and that she was "exposed  to hep a-b" (R. 116).[3] She wrote that she has "poor vision; severe pain in side; cyst on ovaries; extreme nausea; severe panic attacks; severe mood swings; fatigue; anxiety; difficulty speaking clearly; [and] depression" (R. 116). In her Function Report, she wrote that she has "no interest" in brushing her teeth anymore, and that she must sometimes be reminded that she needs to bathe (R. 139-40). Plaintiff says she has "no bills," no savings account and no checking account (R. 141).

Plaintiff is a former smoker and does not drink (R. 34). Plaintiff has a criminal record, and has been jailed on several occasions for DUI, possession of drug paraphernalia, public intoxication, and failure to appear (R. 36). The record is replete with references to plaintiff's prior drug abuse (see, e.g., R. 198, 205). Plaintiff claims

---

[3] Plaintiff subsequently tested negative for hepatitis A or hepatitis B. See R. at 181-85.

that she has not had any drug problems since completing rehabilitation therapy in 2006 (R. 47; *see also* R. at 150-51).

Plaintiff's medical records begin with a March 19, 2008, visit to Dr. Jason Hatfield, during which visit plaintiff complained of lumpy breasts (R. 187). Plaintiff's diagnostic mammogram, taken several days before, was negative (R. 187-92). Plaintiff has undergone three prior breast augmentation surgeries and rhinoplasty (R. 191, 280). Dr. Hatfield noted in plaintiff's records that she had contracted hepatitis C from an ex-boyfriend (R. 192). This is verified by records from a December 19, 2008, visit to a Dr. R. K. Sehgal, which show a positive hepatitis C test and negative hepatitis A and B tests (R. 181-85). Dr. Sehgal listed plaintiff's current medications on that date, but his writing is illegible (R. 181).

On January 29, 2009, plaintiff followed up with Dr. Sehgal (R. 180). He listed her medications on that date as Lithium, 300 mg/twice daily, and Xanax, 0.5 mg/twice daily when necessary (R. 180).[4] Plaintiff followed up again on February 27, 2009 (R. 179); March 27, 2009, where Dr. Sehgal noted that plaintiff had a positive pregnancy test (R. 178); April 24, 2009, where Dr. Sehgal noted that plaintiff was eight weeks

---

[4] Lithium is a drug used to treat bipolar disorder and mania.  *See* PHYSICIANS' DESK REFERENCE 123 (PDR Network, LLC, 2011). Xanax is a brand name of Alprazolam, a generic drug used to treat anxiety and panic disorder. *See* PHYSICIANS' DESK REFERENCE 117 (PDR Network, LLC, 2011).

pregnant with an estimated due date of December 1, 2009 (R. 177); and May 22, 2009, where plaintiff stated she had had another panic attack (R. 176). Plaintiff's medication regimen remained the same throughout this period (R. 175-85).

On February 23, 2009, plaintiff was examined for further evaluation of a positive hepatitis C antibody (R. 389). Plaintiff has tested positive for hepatitis C in March of 2008 (R. 390). Plaintiff was advised to stop drinking and smoking, and that further treatment would begin three months later, upon receipt and evaluation of further test results (R. 390). Once plaintiff learned she was pregnant, her doctors informed her she would not be treated for hepatitis C until after she delivered her baby and began breast feeding (R. 391).

Plaintiff's obstetric records are also included in the record. *See* R. at 276-391. While they mostly pertain to pregnancy and the health of her baby, there are a few items of note. On April 15, 2009, plaintiff's medication list included a flu vaccine and "Valtrex @ 36 wks." (R. 278).[5] Plaintiff is also noted to have a history of genital herpes and trichomoniasis, a sexually transmitted infection (R. 279). A psychosocial assessment also performed April 15, 2009, indicates that plaintiff reported substance abuse problems from 1998-2002, following a car wreck, and that she was treated with

---

[5] Valtrex a brand name of Valacyclovir, a generic drug used to treat herpes and shingles. *See* PHYSICIANS' DESK REFERENCE 127 (PDR Network, LLC, 2011).

methadone (R. 327). Plaintiff also reported she had been diagnosed with bi-polar disorder,[6] and was still taking Lithium and Xanax, as previously prescribed (R. 327). A prenatal summary completed November 10, 2009, indicates that plaintiff has bipolar disease, hepatitis C, herpes simplex vulvitis, seizure disorder, was "rubella non immune," and was anemic (R. 344-45). On June 22, 2009, plaintiff was prescribed Phenergan and Diflucan (R. 370).[7] The latter was prescribed to treat a yeast infection (R. 362, 370). Numerous subsequent prenatal summaries reveal the same information (R. 368-69, 363-65, 361-62, 358-59, 356-57, 353-54, 350-51, 342-43, 339-40, 335-36). Physician notes from a follow-up on January 11, 2010, indicate that plaintiff reported she had begun taking Abilify, and was "doing well" (R. 323).[8]

On June 18, 2009, Dr. Elvadas Radzevicius conducted a psychiatric evaluation of plaintiff for the Disability Determination Service (R. 194-99). His assessment was that plaintiff had mood swings, but that these "fluctuations" were "better . . . on

---

[6] The record does not contain any documents which indicate when plaintiff received this diagnosis; however, numerous physicians who have either examined plaintiff or evaluated her case have noted that she is bipolar and that she takes medicine to treat bipolar disorder, such that this diagnosis appears to be confirmed. *See, e.g.*, R. at 213, 327, 344-45.

[7] Phenergan is a brand name of Promethazine Hydrochloride, a drug used in the treatment of nausea and vomiting. *See* PHYSICIANS' DESK REFERENCE 126 (PDR Network, LLC, 2011). Diflucan is a brand name of Fluconazole, a generic drug used to treat fungal infections. *See* PHYSICIANS' DESK REFERENCE 120 (PDR Network, LLC, 2011).

[8] Abilify is a brand name of Aripiprazole, an anti-depressant used to treat symptoms of schizophrenia, depression and bi-polar disorder. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000221/ (last visited March 26, 2012).

med[icine]" (R. 198). He gave her a Global Assessment of Functioning ("GAF") score of 55 (R. 199).[9] On July 1, 2009, Dr. Radzevicius indicated on a "Request for Medical Information" form from the Alabama Food Stamp Program that plaintiff was not mentally and physically able to work due to bipolar affective disorder (R. 193, 201).

Plaintiff was examined by neurologist Dr. Alfred Paige on June 29, 2009, complaining of a history of seizures (R. 205-208, 384-85). Plaintiff reported a history of head trauma with loss of consciousness (R. 384). A testing plan was implemented, and a follow-up advised for six months later (R. 205, 208, 385).

A medical evaluation provided by Dr. Robert H. Heilpern on August 3, 2009, includes the following statement: "ADL's completed by claimant indicate limitations due to mental conditions and current pregnancy. No significant physical limitations found in ADL form. Claim Rated 02-Not Severe Impairment" (R. 209).

A "Psychiatric Review Technique" form (R. 210-23) filled out by Dr. Robert Estock on August 3, 2009, listed plaintiff as possessing mild limitations restricting activities of daily living and moderate limitations with respect to difficulties in maintaining social functioning and maintaining concentration, persistence, or pace

---

[9] This score falls within the GAF bracket of 60-51, which is associated with "Moderate Symptoms & Impairments." *See* R. at 269.

7

(R. 220). Dr. Estock noted that plaintiff was "[s]table on med[ication]" and that despite the conclusions of Dr. Radzevicius that plaintiff is mentally and physically unable to work, the "objective evidence on file does not support a permanent disability to the level described in the above statements" (R. 222). He also concluded that plaintiff's "statements in regards to [sic] her functional limitations are considered to be partially credible" (R. 222). Dr. Estock further listed numerous moderate limitations in a number of categories on plaintiff's Mental Residual Functional Capacity Assessment (R. 224-27), with the only "marked" limitation being in plaintiff's ability to carry out detailed instructions (R. 224).

Following a psychiatric exam by a Dr. Wolfram Glaser on October 15, 2009, plaintiff was given a GAF score of 50,[10] and noted to be at risk for committing acts of violence (R. 234-35). Dr. Glaser noted that plaintiff has a history of sexual abuse and brain trauma  (R. 234).[11] At a follow-up appointment on November 5, 2009, Dr. Glaser took plaintiff off Lithium and elected to put her on Zyprexa, 2.5 mg/daily at bedtime (R. 230).[12] At a follow-up on December 16, 2009, Dr. Glaser noted that

[10] This score falls within the GAF bracket of 50-41, which is associated with "Moderately Severe Symptoms & Impairments." *See* R. at 269.

[11] Plaintiff told Dr. Glaser that she had been raped twice (R. 234).

[12] Zyprexa is a brand name of Olanzapine, a generic drug used to treat symptoms of schizophrenia and bipolar disorder.  *See* HTTP://WWW.NCBI.NLM.NIH.GOV/PUBMEDHEALTH/PMH0000161/ (last visited March 26, 2012).

plaintiff appeared "stable" on her new medication (R. 229). Plaintiff was also prescribed Abilify, 5 mg/daily in the morning, during that visit,[13] in addition to continuing to take Zyprexa and Xanax (R. 229). At plaintiff's subsequent follow-up on February 9, 2010, plaintiff was prescribed Desyrel, 150 mg/as needed, for insomnia (R. 274). Plaintiff reported "good results" from medicine up to that point (R. 274).

Plaintiff followed up again on April 8, 2010 (R. 267). Dr. Glaser noted plaintiff had been "drooling for a couple of months" from the medication, that plaintiff "has significant anxiety," and "[t]he potential for depression is significant" (R. 267). One month later, on May 10, 2010, Dr. Glaser noted that plaintiff "has begun to feel quite depressed, and has lost her appetite," that her sleep had been "suboptimal," and that she had lost a "great deal of w[eight] and is dysphoric" (R. 265). In addition to the medication she was then taking (Xanax, Abilify, Desyrel, and Zyprexa) plaintiff was prescribed Zoloft, 50 mg/daily.[14] Following up a month later, on June 3, 2010, Dr. Glaser noted that plaintiff was "much improved" (R. 264). His notes indicate she was no longer taking Abilify (R. 264). Her progress was sustained on July 8, 2010, though

---

[13]Abilify is a brand name of Aripiprazole, an anti-depressant used to treat symptoms of schizophrenia, depression and bi-polar disorder. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000221/ (last visited March 26, 2012).

[14] Zoloft is a brand name of Sertraline, a generic drug used to treat anxiety and depression. *See* Physicians' Desk Reference 126 (PDR Network, LLC, 2011).

Dr. Glaser noted that "[p]roblematic side effects [from the medication] are evident" (R. 263).[15] She was also prescribed Seroquel, 100 mg/daily (R. 263).[16] At a follow-up on September 16, 2010, Dr. Glaser noted that plaintiff seemed to be doing worse, and had reported "variable sleep, nightsweats, and [morning] headaches" (R. 262).

Plaintiff received preliminary tests in preparation for treatment of her hepatitis C in February 2010 (R. 396-98), and on February 22, 2010, was listed as a "candidate for treatment" by Dr. Donald Marks (R. 408). The next available records indicate that on May 3, 2010, plaintiff had begun taking a host of medications as treatment for hepatitis C, and that plaintiff was "stable" on treatment  (R. 407). She continued to be "stable" on June 7, 2010 (R. 406). A progress note from July 12, 2010, indicates that "no dosage adj[ustment]" was "needed yet" (R. 403). On August 9, 2010, and at several follow-up visits through November 8, 2010, plaintiff was noted to be "stable on treatment" or "stable on med[ication]" (R. 402, 400, 417-419, 422). The records indicate that plaintiff was experiencing side effects such as fatigue and myalgia (R. 402, 400, 417-19, 422). Notes from a diagnostic imaging report reviewed on December 6, 2010, indicate that plaintiff continued to exhibit "[n]o significant

[15] It was unclear if Dr. Glaser was referring to medications plaintiff was taking for her bipolar disorder or medications she was taking as treatment for hepatitis C (discussed *infra*).

[16] Seroquel is a brand name of Quetiapine, a generic drug used to treat or prevent episodes of mania or depression in individuals with bipolar disorder. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001030/ (last visited March 26, 2012).

abnormalities" as a result of her hepatitis C treatment (R. 410), and she continued to be "stable" (R. 415).

On June 24, 2010, plaintiff was examined by Dr. Carol Leitner for complications due to a deflated left breast implant (R. 394-95). Notes from subsequent physician visits indicate that the implant was later determined to be "ruptured" (R. 255-56), and surgery to remove the implants was discussed at an appointment on September 23, 2010 (R. 252, 399). Removal was scheduled for October 11, 2010 (R. 423). There are no records pertaining to this surgery in the record; however, in the notes for an unrelated physician visit on October 22, 2010, for ear pain, a Dr. Kent Frost noted that plaintiff "had breast augmentation 9 days ago with complaints of some pain at the site of stitches" (R. 425).

On November 9, 2010, plaintiff was evaluated by Dr. Sular Mansur for back pain (R. 411). Tests revealed "[s]cattered early degenerative disc disease and minimal facet changes. No focal disc herniation or protrusion, central nor foraminal stenoses (R. 411).

At the hearing, the VE testified that plaintiff has almost no past relevant work experience, at most "[b]rief periods of employment anywhere from three or four days up to two months," mostly "unskilled work . . . light work. Individually, it doesn't appear to be past relevant work or even collectively"  (R. 49-50). The ALJ posed

several hypothetical questions to the VE regarding a hypothetical individual with symptoms comparable to plaintiff's. First, the ALJ assumed an individual with plaintiff's age, education, and professional background who is capable of performing work at the light level of exertion that does not require "the introduction of work in which contact with the general public or coworkers was frequent" (R. 50). The VE testified that such individual could perform work such as cleaning jobs, "material handling jobs," and sorting jobs (R. 50-51). The ALJ's next hypothetical was mostly inaudible and so is not present in the record, but in response the VE testified that there would be jobs at the sedentary level that the hypothetical individual could perform, such as "bench and table work" (R. 51). Finally, when the ALJ asked if plaintiff herself, assuming all her testimony to be credible and accurate, could perform any work, the VE replied in the negative (R. 51). He stated that "both non-exertionally the psychological factors [plaintiff] indicated" and "the non-psychological factors, the fatigue, . . . the inability to sustain activity for even two hour increments to put together eight hours . . . a day in any combination of work" would limit plaintiff's activity, and that the psychological factors such as "not being able to tolerate other people, not being able to even function within her own home . . . would certainly suggest an eight-hour workday in a competitive work environment couldn't be tolerated" (R. 51-52). The VE noted that treatment notes by one of

12

plaintiff's treating physicians supported his conclusions (R. 52-53).

## Standard of Review

In a Social Security case, the initial burden of establishing disability is on the claimant, who must prove that due to a mental or physical impairment he is unable to perform his previous work. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). If the claimant is successful, the burden shifts to the Commissioner to prove that the claimant can perform some other type of work existing in the national economy. *Id.*

This court's review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence" is generally defined as "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

This court also must be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988); *Bridges v. Bowen*, 815 F.2d 622, 624

(11th Cir. 1987); *Davis v. Shalala*, 985 F.2d 528 (11th Cir. 1993). No presumption of correctness applies to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. *Brown v. Sullivan*, 92 F.2d 1233, 1235 (11th Cir. 1991); *Corneliuis v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991). Furthermore, the Commissioner's "failure to . . . provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius*, 936 F.2d at 1145-46. When making a disability determination, the Commissioner must, absent good cause to the contrary, accord substantial or considerable weight to the treating physician's opinion as against the opinions of other physicians. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988); *Walker*, 826 F.2d at 1000.

## Legal Analysis

In this case, the ALJ found that plaintiff has the severe impairments of bipolar disorder, hepatitis C, and low back pain (R. 16). He then denied the plaintiff benefits, finding that her mental impairment does not "meet[] or medically equal" the so-called "Paragraph B" criteria, listed in 20 CFR Part 404, Subpart P, Appendix 1, and that "no treating, examining or reviewing physician has suggested the existence of any impairment or combination of impairments" that would meet the criteria (R. 16). As the ALJ summarized, to satisfy the relevant criteria, the mental impairment "must

result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme." (R. 16). The ALJ found that in activities of daily living, plaintiff has "no more than mild restriction"; in social functioning, she has "no more than moderate difficulties"; with regard to concentration, persistence, or pace, she has "no more than moderate difficulties"; and with regard to episodes of decompensation, she has experienced none of "extended duration" (R. 17). Accordingly, "[b]ecause [plaintiff's] mental impairment does not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration," the relevant criteria "are not satisfied" (R. 17).The ALJ found that plaintiff's impairment "could reasonably be expected to cause the alleged symptoms," but that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" the residual capacity assessment (R. 18). He concluded that plaintiff has the residual functional capacity to perform "light work . . . that allows for unskilled, simple work tasks and no production quotas," provided that "contact with the general public and co-workers must be brief and casual" and that plaintiff

"is also restricted from working around unprotected heights, and . . . avoid[s] the hazards of moving machinery" (R. 18).

The ALJ's findings are simply not supported by substantial evidence; in fact, they appear to contradict the weight of substantial evidence, which the ALJ appears mostly to have discounted. The Eleventh Circuit Court of Appeals has stated that the opinion of a treating physician is to be given substantial weight in determining disability. *See Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986); *Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir. 1986); *Spencer on behalf of Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985). Absent good cause to the contrary, the Commissioner must accord substantial or considerable weight to the treating physician's opinion. *See Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988); *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987); *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

Here, plaintiff's treating psychiatrist, Dr. Evaldas Radzevicius, indicated on July 6, 2009, that Plaintiff was permanently disabled due to bipolar affective disorder (R. 193, 201). On September 20, 2010, Dr. Radzevicius indicated that plaintiff would have a "marked" impairment of ability to respond to customary work pressures. (R. 258). The vocational expert present at plaintiff's hearing testified that with such a limitation, plaintiff would be incapable of any work-related activities (R. 52-53). Dr.

Radzevicius's opinion is supported by his treatment notes, which indicate ongoing treatment for bipolar affective disorder with symptoms including panic attack episodes, mood swings, decreased sleep, depression, and impaired and poor concentration (R. 196-199). If the ALJ had given this opinion proper weight as dictated by the Eleventh Circuit, he would have found plaintiff disabled due to plaintiff's impairments. However, as noted above, the ALJ found that "[t]hat portion of [Dr. Radzevicius's] opinion finding a 'marked' limitation is without substantial support of the other evidence of record," and accorded his diagnosis "little weight" (R. 20). The ALJ also intimated that Dr. Radzevicius's opinion is to be given limited weight because it goes to the issue of disability, which is an issue "reserved to the Commissioner" (R. 20).

While it is true that the Social Security Administration reserves to itself the issue of "disability" (*See* Social Security Ruling 96-5p), it has also specifically stated that opinions from any medical source about issues reserved to the Commissioner must never be ignored, even in the absence of clarity: "For treating sources, the rules require that we make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us." Thus, an ALJ may not simply dismiss a treating opinion at his whim. Dr. Radzevicius's opinion is fully supported by the

17

evidence of record. If the ALJ had doubts as to the accuracy of Dr. Radzevicius's diagnosis, the regulations make clear he should have recontacted Dr. Radzevicius rather than dismiss his opinion to the detriment of plaintiff.

Further, the ALJ's conclusion that the Plaintiff's hepatitis C is "stable" and thus not of a disabling level is inconsistent with the medical evidence of record. Throughout the treatment records from Cooper Green Mercy Hospital there is documentation of weakness, fatigue, dyspnea, easy fatigability, depression, and anxiety. *See* R. at 237-255. The Plaintiff started Interferon treatment for hepatitis C in April 2010 (R. 237, 408), but in October and November 2010 was still observed experiencing the same symptoms described above (R. 417-422). She was described on November 4, 2010, as experiencing fatigue and being "ill appearing" (R. 418). Though her hepatitis C was described as "stable" on November 8, 2010, she was described on December 6, 2010, precisely one month before hearing, as experiencing swollen tongue, weakness/fatigue, headache, myalgia, arthralgia, constipation, easy bruising, depression, and cognitive problems including decreased memory (R. 415).

The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983). The ALJ is required, however, to state with particularity the weight he gives to different medical opinions and the reasons why. *Sharfarz v. Bowen*, 825 F.2d 278,

279 (11th Cir. 1987).

> Absent "good cause," an ALJ is to give the medical opinions of treating physicians "substantial or considerable weight." *Lewis*, 125 F.2d at 1440; *see also* 20 C.F.R. §§ 404.1527(d)(1)-(2). Good cause exists "when the: (1) treating physician's opinion was not bolstered by evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.2d at 1241. With good cause, an ALJ may disregard a treating physician's opinion, but he "must clearly articulate [the] reasons" for doing so. *Id.* at 1240-41.

*Winschel v. Comm'r of Soc. Security*, 631 F.3d 1176, 1179 (11th Cir. 2011). In short, "good cause" exists if the opinion is wholly conclusory, unsupported by the objective medical evidence in the record, inconsistent within itself, or appears to be based primarily on the patient's subjective complaints. *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *see also Crawford v. Comm'r of Soc. Security*, 363 F.3d 1155, 1159-60 (11th Cir. 2004); *Lewis*, 125 F.3d at 1440.

The ALJ here did not have good cause for disregarding the treating physicians' opinions. No medical evidence contradicts plaintiff's psychiatrist's conclusions; indeed, with respect to plaintiff's history of bipolar disorder, the ALJ improperly dismissed the only opinion evidence from a treating or examining source contained in the claim file. With respect to plaintiff's hepatitis C, the substantive medical evidence of record, including numerous examples of plaintiff's symptoms failing to improve despite months of treatment, is directly contrary to the ALJ's conclusion that

plaintiff's hepatitis C is "stable." Even the VE testified that in a hypothetical scenario involving an individual with symptoms identical to plaintiff, "an eight-hour workday in a competitive work environment couldn't be tolerated" (R. 51-52).

In light of these considerations, the court finds the record devoid of substantial evidence to support the decision of the ALJ. The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991). Before the court in this case are multiple medical opinions concerning the nature, origins, and severity of plaintiff's mental disability due to chronic bipolar disorder, from which the record demonstrates she has suffered for decades, as well as plaintiff's debilitating hepatitis, which has largely been unresponsive to treatment. By inferring that plaintiff was able to work from his selective review of the evidence, the ALJ substituted his opinion for that of all of the medical reports in the file, which taken together establish that plaintiff is indeed disabled.

### Conclusion

Based on the foregoing, the court is of the opinion that the decision by the ALJ was not supported by substantial evidence, and therefore the decision of the Commissioner must be **REVERSED** and this case **REMANDED** for the calculation

20

of benefits to which plaintiff is entitled. The court shall do so by separate order.

**DONE** and **ORDERED** the 12th day of April 2012.


_____
INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE